IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MOHAMMAD RIMI, et al.** <br><br> **Petitioners,** <br><br> v. <br><br> **GEORGE W. BUSH, et al.** <br><br> **Respondents.** | **STATUS REPORT** <br><br> No. 1:05-CV-02427 |

Petitioner Mohammad Rimi,[1] through his attorneys, respectfully submits this report on the status of his case, in accordance with this Court's order of July 3, 2008. See Rimi v. Bush, No. 05-CV-02427 (D.D.C. July 3, 2008) (order establishing procedures for status report) (Dkt. No. 18).

**I.      Factual and Procedural Histories**

Muhammad Abdallah Mansur Safrani Al Futuri Rimi ("Petitioner" or "Mr. Rimi"), (ISN #194), age 39, is a citizen of Libya. In 2002, Mr. Rimi was taken into custody by United States armed forces in Afghanistan and brought to Guantánamo Bay Naval Base, Cuba ("Guantánamo Bay"), where the United States continued to hold him for the next four years. Mr. Rimi's detention at Guantánamo was unlawful, as Mr. Rimi was not and never had been an enemy alien, lawful or unlawful belligerent, or combatant of any kind, and had never been "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in and armed conflict against the United States." Hamdi v. Rumsfeld, 542 U.S. 507, 516 (2004). Mr. Rimi filed a petition for writ of habeas corpus in this court on December 19, 2005, challenging his designation as an enemy combatant under Hamdi v. Rumsfeld, 542 U.S. 507 (2004). See Petition for Writ of Habeas Corpus ("Pet."), ¶ 53 (Dkt. No. 1). The government has not filed a factual return.

During his detention in Guantánamo Bay, Mr. Rimi received a Combatant Status Review Tribunal hearing and two annual Administrative Review Board hearings, and during each of these he disputed the accuracy of substantial portions of the government's evidence against him. See Summarized Detainee Statement, ISN #194, 3124, 3127, available at http://www.dod.mil/pubs/foi/detainees/csrt_arb/Set_46_3096-3129.pdf. For example, Mr. Rimi disputed that he was a member of al Qaida, that he was a member of the Taliban, and that he was a member of the Libyan Islamic Fighting Group. See Summary of Administrative Review Board

---

[1]      Mr. Rimi has petitioned for the writ habeas corpus. Mr. Omar Deghayes was identified as Mr. Rimi's "next friend" in Mr. Rimi's petition. Hereafter, this status report will refer only to petitioner Rimi and not to petitioner Deghayes.

Proceedings for ISN 194, 2104, 2113, available at http://www.dod.mil/pubs/foi/detainees/csrt_arb/ARB_Transcript_2100-2195.pdf.  Mr. Rimi also explained his fear of religious persecution in Libya and made a claim for political asylum.  Id. at 2117-18.  On information and belief, during his time in Guantánamo Bay, Mr. Rimi was visited by Libyan agents who indicated that they would torture and perhaps kill him should he be returned to their custody in Libya.  On information and belief, Mr. Rimi told U.S. government officials at Guantánamo Bay that he was afraid of being tortured or killed upon return to Libya.

On December 20, 2006, the government filed a Notice of Transfer in this matter, which stated that "the United States ha[d] relinquished custody of petitioner Mohammed Rimi, a.k.a. Mohammad Rimi, (ISN 194) and transferred him to the control of the Government of Libya."  See Notice of Transfer of Petitioner (Dkt. No. 13).  The government transferred Mr. Rimi without removing his enemy combatant status and without providing prior notice to undersigned counsel.  Reports indicate that at the time he was transferred to Libya, Mr. Rimi had tuberculosis and wounds on his arms.  See Human Rights Watch, Libya: Rights at Risk, available at http://hrw.org/english/docs/2008/01/03/libya17674.htm.

United States government officials have claimed that Mr. Rimi remains in custody of the Libyan government, without access to counsel and without having been charged with crimes.  Id.  Access to Mr. Rimi was denied to the organization Human Rights Watch as of March 2008.  Id.

After Mr. Rimi was transferred to the government of Libya, the United States (without having filed a factual return) moved to dismiss Mr. Rimi's habeas corpus petition in a motion filed on April 19, 2007.  See Motion to Dismiss (Dkt. No. 15).  Mr. Rimi opposes this motion to dismiss and also requests an opportunity directly to oppose the motion, to the extent that this Court deems such an opposition necessary.

**II.    Reasons Why Mr. Rimi's Habeas Petition Should Proceed**

Notwithstanding his transfer to the custody of the Libyan government, Mr. Rimi remains entitled to pursue his petition for a writ of habeas corpus.  See Boumediene v. Bush, 533 U.S. __ (2008) (slip op. at 66); Carafas v. LaVallee, 391 U.S. 234 (1968).

**A.    Collateral Consequences**

Mr. Rimi is entitled to the Great Writ notwithstanding the fact that the United States transferred Mr. Rimi to the custody of the Libyan government.  Jurisdiction in a habeas corpus petition attaches at the time of filing and is not defeated by the release of a petitioner where, as here, he continues to suffer collateral consequences of his unlawful detention.  Carafas, 391 U.S. at 237 (1968).  Collateral consequences sufficient to allow a case to go proceed include: restrictions on liberty imposed by parole, including registration of address, periodic reporting to a parole officer, and restrictions on travel, see Jones v. Cunningham, 371 U.S. 236, 241-43 (1963); restrictions from serving as a labor union official, voting, and jury service, see Carafas, 391 U.S. at 237; and commitment as a sex offender that included voting restrictions, jury service

11082212.4                                                      2

disqualification, special driver's license examinations, and limited access to a gun license, see White v. White, 925 F.2d 287, 290 (9th Cir. 1991).[2]

The "enemy combatant" label establishes a *prima facie* collateral consequence sufficient to establish that this case is not moot.  See Carafas, 391 U.S. at 239-40; Sibron v. New York, 392 U.S. 40, 55 (1968) (actual collateral consequences need not be proven where the mere possibility that such consequences may exist is sufficient to preserve a live controversy).  Mr. Rimi suffers far more than just the harmful effects of the "enemy combatant" designation, however.  His transfer was effectuated through an agreement between the United States and Libyan governments.  While the full contours of that agreement are not currently available to Mr. Rimi, it is believed that Mr. Rimi is still in the custody of the government of Libya, and his designation as an enemy combatant may well mean torture, execution and/or prolonged arbitrary detention.  See *United States Department of State*, Country Reports on Human Rights Practices – 2006: Libya (available at http://www.state.gov/g/drl/rls/hrrpt/2006/78858.htm).

### B.     Mr. Rimi's Transfer and the Convention Against Torture

The transfer of Mr. Rimi to the government of Libya created – and continues to create – the likelihood that he will be subjected to torture.[3]  Mr. Rimi also seeks an adjudication and determination on the lawfulness of his transfer.  Because Mr. Rimi's transfer to Libya could well mean torture, execution and/or prolonged arbitrary detention, it is likely that the transfer itself was unlawful.  See Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 1465 U.N.T.S. 85, Art. 3, S. Treaty Doc. No. 20, 100th Cong., 2d Sess., p. 6 (1988) ("1. No State Party shall expel, return ("refouler") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.  2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights."); see also, Foreign Affairs Reform and Restructuring Act of 1998 (FARR Act), div. G, 112 Stat. 2681-822 ("It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States").

---

[2] In Qassim v. Bush, 466 F.3d 1073, 1076 (D.C. Cir. 2006), the court noted that the collateral consequences doctrine could enable a released Guantanamo habeas petitioner to continue his litigation.

[3] Of Libya's treatment of its prisoners, the United States Department of State reports: "The reported methods of torture and abuse included chaining prisoners to a wall for hours; clubbing; applying electric shock; applying corkscrews to the back; pouring lemon juice in open wounds; breaking fingers and allowing the joints to heal without medical care; suffocating with plastic bags; depriving detainees of sleep, food, and water; hanging by the wrists; suspending from a pole inserted between the knees and elbows; burning with cigarettes; threatening with dog attacks; and beatings on the soles of the feet."  U.S. Dep't of State, Country Conditions Reports on Human Rights Practices, March 2008, available at http://www.state.gov/g/drl/rls/hrrpt/2007/100601.htm.

### III. Scheduling and Procedural Issues

- Petitioner has not opposed the Government's April 19, 2007 motion to dismiss. If the Court deems such an opposition necessary, petitioner requests leave to oppose the motion.
- No factual return was filed in this matter. Petitioner requests an order from this Court requiring the government to file a return, based on the evidence available in the aforementioned CSRT and ARB hearing transcripts, only.
- Petitioner seeks the Court's authority to obtain discovery on the contours of the United States' agreement(s) with the government of Libya affecting or governing the treatment of Mr. Rimi.
- Undersigned counsel note that they have only recently sought security clearances and would need this process to be expedited in order to effectively brief the pending legal issues.
- No protective order has issued in this case. Petitioner requests a ruling from this Court regarding whether the protective order instructions in the cases before Senior Judge Hogan is required in order to begin the discovery required to adequately challenge Mr. Rimi's illegal detention.
- Consistent with this Court's ruling from the bench on July 10, 2008 entitling him to such a conference, Petitioner requests a status conference in this matter.

Dated:   July 14, 2008

Respectfully submitted,

NIXON PEABODY LLP
Counsel for Petitioners

/s/ Brian M. Childs
W. Scott O'Connell
Brian M. Childs
100 Summer Street
Boston, MA 02110
Tel: 617-345-6139
Fax: 866-893-7801