# EXHIBIT B

Case 1:05-cv-02427-RJL   Document 26-3   Filed 08/12/2008   Page 1 of 12

# U.S. DEPARTMENT of STATE

# Libya

Country Reports on Human Rights Practices - 2006
Released by the Bureau of Democracy, Human Rights, and Labor
March 6, 2007

The Great Socialist People's Libyan Arab Jamahiriya is an authoritarian regime with a population of approximately six million, ruled by Colonel Mu'ammar Al-Qadhafi since 1969. The country's governing principles are derived predominantly from Colonel Qadhafi's Green Book ideology. In theory citizens rule the country through a pyramid of popular congresses communes, and committees, as laid out in the 1969 Constitutional Proclamation and the 1977 Declaration on the Establishment of the Authority of the People. However, in practice Qadhafi and his inner circle monopolized political power. On March 5, Secretary of the General People's Congress (GPC) al-Baghdadi al-Mahmoudi and the remaining delegates of the 760-member GPC began a three-year term. Revolutionary Committees are nominally extragovernmental organizations that monitor adherence to revolutionary ideology, but in practice the committees' role was unclear and increasingly marginal. The civilian authorities generally maintained effective control of the security forces.

The government's human rights record remained poor. Citizens did not have the right to change their government. Reported torture, arbitrary arrest, and incommunicado detention remained problems. The government restricted civil liberties and freedoms of speech, press, assembly, and association. The government did not fully protect the rights of migrants, asylum seekers, and refugees. Other problems included poor prison conditions; impunity for government officials; lengthy political detention; denial of fair public trial; infringement of privacy rights; restrictions of freedom of religion; corruption and lack of transparency; societal discrimination against women, ethnic minorities, and foreign workers; trafficking in persons; and restriction of labor rights.

The government took a positive step during the year. On March 2, the government released 132 political prisoners, including 86 members of the Muslim Brotherhood held since 1988 and journalist Abd Al-Raziq Al-Mansuri.

## RESPECT FOR HUMAN RIGHTS

Section 1 Respect for the Integrity of the Person, Including Freedom From:

a. Arbitrary or Unlawful Deprivation of Life

There were no reports that the government or its agents committed arbitrary or unlawful killings.

According to a September 13Human Rights Watch (HRW) report, witnesses interviewed in April and May 2005 claimed that abuse by detention center guards led to the deaths of three detainees (see section 1.c.).

The government did not release publicly any information on its investigation into the May 2005 abduction, abuse, and killing of Daif Al Ghazal, a prominent opposition journalist and anticorruption activist. According to HRW the government stated that it could not provide information about the case without compromising its investigation. In August the government stated it had detained two suspects. Some human rights groups raised concerns that a government autopsy in the Al Ghazal case omitted key details necessary for a police investigation.

b. Disappearance

There were no reports of politically motivated disappearances.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits such practices, but security personnel routinely tortured prisoners during interrogations or as punishment. Government agents reportedly detained and tortured foreign workers, particularly those from sub-Saharan

Africa. Reports of torture were difficult to corroborate since many detainees were held incommunicado.

The reported methods of torture and abuse included chaining prisoners to a wall for hours, clubbing, applying electric shock, applying corkscrews to the back, pouring lemon juice in open wounds, breaking fingers and allowing the joints to heal without medical care, suffocating with plastic bags, prolonged deprivation of sleep, food, and water, hanging by the wrists, suspension from a pole inserted between the knees and elbows, cigarette burns, threats of dog attacks, and beatings on the soles of the feet.

According to HRW the government claimed that it prosecuted officials who mistreated detainees in detention facilities. The government stated that it investigated 43 cases of alleged torture and brought 48 defendants to trial in 2004. The government did not specify the outcome of the trials or provide similar statistics for 2005 or this year.

Since 2000 sixforeign medical personnel charged with deliberately infecting children in a hospital in Benghazi with the HIV virus testified repeatedly that they had been tortured with electric shocks and beatings to extract confessions. The medical personnel also testified to two cases of rape. In June 2005 a court acquitted 10 security officials accused of torture (see section 1.e.).

In March 2005 representatives of Physicians for Human Rights (PHR) and the International Federation of Health and Human Rights Organizations visited political detainee Fathi Al-Jahmi and reported that his isolated confinement and sporadic and inadequate medical treatment constituted cruel, inhuman, and degrading treatment (see section 1.e.).

Prison and Detention Center Conditions

According to foreign diplomats and international organizations, prison and detention center conditions ranged from poor to adequate. Pretrial detainees and convicts were held in the same facilities. Reportedly more than half of the prisoners in the country were pretrial detainees. Prison officials frequently held pretrial detainees for long periods (see section 1.d.).

Security forces reportedly subjected detainees to cruel, inhuman, or degrading conditions and denied adequate medical care, which led to several deaths in custody.

On October 4, according to press accounts, clashes between prisoners and guards at the Abu Salim prison killed one prisoner, Hafed Mansour Al-Zwai, and injured 17.

For three weeks in April and May 2005, HRW visited the country after a 15-year absence and received access to police stations, prisons, and prisoners. According to HRW prison conditions appeared generally adequate, but overcrowding and abuse by security forces as punishment were problems. According to HRW witnesses reported that physical abuse by guards led to the deaths of three detainees (see section 1.a.); one interviewee said that he saw what he believed to be rape, while three witnesses reported that security officials threatened women detainees with sexual violence. HRW stated that some detention conditions for migrants and refugees reportedly improved since some of the interviewees were detained.

In February 2004 the government permitted Amnesty International (AI) to visit some prisons and speak with inmates that it considered "prisoners of conscience." During its visit AI raised concerns with the government about the health of 86 Muslim Brotherhood prisoners in Abu Salim prison who undertook a seven-day hunger strike to protest lengthy delays in their appeal process. On March 2, the government released these 86 prisoners. In March 2005 the government also allowed PHR representatives to examine a limited number of detention facilities.

In May 2005 the authorities established a committee to investigate the 1996 Abu Salim prison riot, in which a large but unknown number of prisoners died. According to HRW the government did not provide information on the timing of the investigation and has not responded to subsequent HRW requests for details on the investigation's progress. Similarly, AI did not receive a reply from the government to its formal request for information. AI officials reported that they continued to receive inquiries from family members of prisoners possibly involved in the 1996 incident. Since 2001according to the Switzerland-based Libyan Human Rights Solidarity (LHRS), government officials notified 112 families that a family member died in the incident, but officials did not provide a body or explain the cause of death. An additional 238 families have not received confirmation from the government on the status of their family members.

According to LHRS, Muhammad Bosadra, a prisoner who reportedly negotiated with guards during the incident, has been held incommunicado since 2005, when government officials moved him from Abu Salim to an unknown facility.

Unlike in previous years, the government allowed the United National High Commissioner for Refugees (UNHCR) local office regular access to detention facilities.

d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention; however, the government did not observe these prohibitions. There were reports that security forces arbitrarily arrested and detained citizens during the year.

On April 19, authorities reportedly released Kamel Mas'ud Al-Kilani, who was arrested, taken to an unknown destination, and detained for 10 months, according to the Libya Watch for Human Rights. Authorities arrested Al-Kilani despite government assurances of safety upon his 2005 return to the country, but the government did not bring charges against him. At year's end authorities had not yet returned his passport.

According to a December 4 HRW report, security forces detained an outspoken regime critic, Idrees Mohammed Boufayed, on November 5. On September 30, Boufayed returned after living in Switzerland for 16 years. HRW reports that security agents confiscated Boufayed's passport upon his arrival in the country. Security agents came to Boufayed's home and ordered him to report to the local Internal Security Agency office where they then ordered him to report to the agency's main office in Tripoli. On December 29, security forces subsequently released Boufayed.

AI reported that security officials detained Mahmoud Mohammed Boushima, a government critic resident in the UK since 1981, during a July 2005 trip to the country. He remained in custody at year's end.

Role of Police and Security Apparatus

The country maintains an extensive security apparatus that includes police and military units, multiple intelligence services, local revolutionary committees, people's committees, and "purification" committees. The result is a multilayered, pervasive surveillance system that monitors and controls the activities of individuals. The legal basis of security service authority is unclear; citizens have no obvious recourse if they believe security services have exceeded their authority. Frequently cited laws are the 1971 and 1972 "Protection of the Revolution" laws, which criminalize activities based on political principles inconsistent with revolutionary ideology. Although the law prohibits arbitrary arrest and detention, in practice security services can detain individuals without formal charges and hold them indefinitely without court convictions. Security forces committed numerous, serious human rights abuses with impunity, including the detentions of al-Kilani, Boufayed, and Boushima (see section 1.d.).

Many citizens perceived corruption as a severe problem. Perceptions of favoritism based on family or personal connections were widespread (see section 3).

Arrest and Detention

The law provides that detainees can be held after arrest for up to 48 hours at a police station. They must then be brought before a prosecutor, who can hold them for six days for investigation. While the law requires that detainees be informed of the charges against them, this law was not enforced in practice. Detainees must then be brought before a judicial authority at regular intervals of 30 days to renew their detention order.

By law bail must be set for pretrial detainees, detainees must have access to counsel, and public defenders represent those who cannot afford a private attorney. Detainees reportedly did not receive information on their rights to legal representation during interrogation. According to authorities detainees have access to family members.

Incommunicado detention was a problem. The government held many political detainees incommunicado for unlimited periods in unofficial detention centers controlled by members of the revolutionary committees. The government reportedly held hundreds of political detainees, many associated with banned Islamic groups, in prisons throughout the country, but mainly in the Abu Salim prison. Some human rights organizations estimated there were approximately two thousand political detainees, many held for years without trial. Hundreds of other detainees may have been held for periods too brief (three to four months) to permit confirmation by outside observers.

According to a September 13 HRW report, in 2005 migrants and refugees in detention centers complained consistently of not being informed of the reason for their arrest, lengthy periods of pretrial detention, and restricted access to a lawyer.

Women and girls suspected of violating moral codes reportedly were detained indefinitely in "social rehabilitation" homes (see section 5).

Amnesty

On September 3, as part of its annual Revolution Day commemoration, the government reportedly pardoned 1,700 prisoners, including foreigners, serving sentences related to civil matters. The government regularly pardons prisoners during the September holiday.

e. Denial of Fair Public Trial

The law provides for an independent judiciary; however, it was not independent in practice. The law stipulates that every person has the right to resort to the courts; however, security forces had the authority to pass sentences without trial, particularly in cases involving political opposition. The legal basis for security force authority is unclear. Some NGOs cited the 1971 and 1972 "Protection of the Revolution" laws (see section 1.d.). Security services intimidated, harassed, and detained individuals without formal charges and held them indefinitely without court convictions, particularly in cases involving political opposition. The government used summary judicial proceedings to suppress domestic dissent. Qadhafi may interfere in the administration of justice by altering court judgments, replacing judges, or manipulating the appeal system. The judiciary failed to incorporate international standards for fair trials, detention, and imprisonment.

The judicial system is composed of four tiers. The summary courts hear cases involving misdemeanors. The decisions of this court may be appealed to the courts of first instance. These courts are composed of chambers of three judges and have the authority to adjudicate in all civil, criminal, and commercial cases. In addition, the jurors apply the Shari'a principles in cases involving personal status. Cases from the courts of first instance may be appealed to the three courts of appeal, which are composed of panels of three judges. The Shari'a court of appeals hears cases from the lower Shari'a court.

The final court of appeal is the Supreme Court, composed of five separate chambers of five judges, which rules by majority decree. The court has chambers for civil and commercial, criminal, administrative, constitutional, and Shari'a. The GPC elects the presiding president and other members of the Supreme Court.

The Supreme Council for Judicial Authority is the administrative authority of the judiciary that handles appointments, transfers, and disciplinary matters.

Trial Procedures

The law provides for the presumption of innocence, informing defendants of the charges against them, and the right to legal counsel. In practice defendants often were not informed of the charges against them and usually had little contact, if any, with their lawyers. Defense lawyers automatically were appointed, even if the defendant declined to have one.

In January 2005 the GPC abolished the People's Court, a special tribunal outside of the judicial system, which violated fair trial standards during the prosecution of political cases. However, in the past the revolutionary committees convened national security courts to try political offenses. Such trials often were held in secret or in the absence of the accused. The government must review all past cases of prisoners found guilty by the People's Court. Reviews were ongoing at year's end.

In 2004 a court sentenced to death six foreign health workers accused of deliberately infecting 426 children with HIV-tainted blood in 1999. The sentences reportedly were based on confessions that the accused made under torture (see section 1.c.). International observers reported serious concerns about the lack of investigation into allegations of torture and delays in bringing the case to a conclusion. In December 2005 the Supreme Court accepted the appeal of the medics and ordered a retrial by the criminal court, which began on May 11. Authorities denied the defendants and their lawyers the right to call witnesses or present evidence while giving wide latitude to the prosecution. Defendants and their lawyers had limited access to government-held evidence. At the December 19 conclusion of the retrial, the court announced sentences of death for the six health workers. At year's end the Supreme Court was reviewing the verdict.

Political Prisoners and Detainees

A large but unknown number of individuals were convicted and imprisoned for engaging in peaceful political activity over a number of years for belonging to an illegal political organization. The law bans any group activity based on any political ideology contrary to the principles of the 1969 revolution.

At year's end political activist and Qadhafi critic Fathi Al-Jahmi remained in incommunicado detention. In 2002 security forces detained Al-Jahmi after he called publicly for democratic reforms and released him in March 2004. The government detained him again two weeks later after he gave several interviews to foreign press calling for reforms. In May 2005 HRW visited Al-Jahmi, and he stated that he faced three charges: trying to overthrow the government, slandering Qadhafi, and contacting foreign authorities. According to HRW the government contended it arrested Al-Jahmi both for telephoning

foreign officials and "providing them with information with the purpose of making their countries hate the Great Jamahiriya," and also for conspiring to serve the interests of a foreign country. HRW reported that Al-Jahmi's lawyer believes these charges could carry the death penalty. According to a May 4 HRW report, the government had not brought formal charges against Al-Jahmi, and the case was still under investigation.

On March 2, the government released journalist Abd Al-Razia Al-Mansuri, whom it reportedly held incommunicado after his January 2005 arrest. According to HRW Al-Mansuri wrote Internet articles critical of the government and society. The government claimed to have arrested and sentenced Al-Mansuri in October 2005 for illegal possession of a handgun.

Civil Judicial Procedures and Remedies

Courts of first instance have the authority to hear civil, criminal, and commercial cases. Civil cases, like criminal cases, may be appealed. The Supreme Court is the court of appeals for all civil cases and has a separate chamber devoted to civil matters. In practice citizens did not have access to courts to seek damages for, or cessation of, a human rights violation. Security services intimidated, harassed, and detained individuals outside of the legal system and without judicial oversight. In practice individuals did not have the right to seek redress for security service actions in civil court.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The law prohibits such actions; however, the government did not respect these prohibitions. The security agencies often disregarded the legal requirement to obtain warrants before entering a private home. They routinely monitored telephone calls and reportedly monitored the Internet.

The security agencies and the revolutionary committees oversaw an extensive network of informants engaged in surveillance for the government. The government threatened to seize and destroy property belonging to "enemies of the people" or those who "cooperate" with foreign powers. Exiles reported that family members of suspected government opponents were harassed and threatened with detention.

Collective punishment was inflicted on the relatives of individuals, particularly oppositionists convicted of certain crimes. The law provides for punishments including the denial of access to utilities (water, electricity, and telephone), fuels, food supplies, official documents, participation in local assemblies, and the termination of new economic projects and state subsidies.

There were no reports of the application of the purge law that provides for the confiscation of private assets above a nominal amount, describing wealth in excess of such undetermined amounts as "the fruits of exploitation or corruption."

Section 2 Respect for Civil Liberties, Including:

a. Freedom of Speech and Press

The law provides for freedom of speech "within the limits of public interest and principles of the Revolution"; however, in practice the government severely limited the freedoms of speech and press, particularly any criticism of government officials or policy. According to Reporters Without Borders (RSF), press freedom slightly improved since 2005. The government tolerated some difference of opinion in people's committee meetings and at the GPC.

The government prohibited all unofficial political activities. By law many forms of speech or expression may be interpreted as illegal. Pervasive self-censorship stemmed largely from the wide reach of security services and broad networks of informants throughout society (see section 1.f.).

On March 2, the government released Abd Al-Raziq Al-Mansuri, who was arrested in January 2005 after publishing articles critical of the government and society on a foreign Web site (see section 1.e.).

At year's end the government continued to detain political activist Fathi Al-Jahmi after he denounced the regime to foreign media (see section 1.e.).

In May 2005 unidentified individuals abducted and killed journalist and out-spoken government critic Daif Al-Ghazal. In June 2005 authorities found his body and later detained two men in connection with an open investigation (see section 1.a.).

The government owned and controlled virtually all print and broadcast media. The official news agency, JANA, was the

designated conduit for official views. The government did not permit the publication of opinions inconsistent with official policy. A single privately-owned radio station, broadcasting popular music and hourly JANA news reports, reportedly opened with government permission. Local revolutionary committees published several small newspapers.

Few foreign publications were available. The government routinely censored foreign publications and at times prohibited their distribution. On July 1, an offshoot of the semi-official Qadhafi International Development Foundation began distributing foreign publications for the first time within the country. While the publications law in theory restricts publishing rights to public entities, in practice, private companies were able to publish.

Satellite television was widely available, although the government censored foreign programming at times.

Internet Freedom

A sole service provider offered Internet access. The number of Internet users was small but growing. According to the United Nations Development Program (UNDP), approximately four percent of citizens regularly used the Internet. The government occasionally blocked certain Internet sites, chiefly political opposition Web sites, and reportedly monitored Internet communications.

Academic Freedom and Cultural Events

The government severely restricted academic freedom. Professors and teachers who discussed politically sensitive topics faced the risk of government reprisal.

The government must approve all cultural events in advance. Any group or individual seeking to organize a cultural event required a government sponsor. The government at times denied permission for musical performances.

b. Freedom of Peaceful Assembly and Association

Freedom of Assembly

The law stipulates that "individuals may meet peacefully, and no police personnel are entitled to attend their meetings; moreover, they are not obliged to notify the police of such gatherings." The law also provides for the right to hold public meetings in accordance with the regulations set by the law. However, the government severely restricted these rights in practice. The government permitted public assembly only with its express approval and only in support of the government's positions.

Freedom of Association

The government restricted the right of association to institutions affiliated with the government. The government did not allow the formation of groups based on political ideology (see section 3). Political activity deemed treasonous by the government carries the death penalty. Such an offense may include any activity inconsistent with the principles of the 1969 revolution.

c. Freedom of Religion

There is no explicit law addressing religious freedom; however, the Great Green Charter on Human Rights of the Jamahiriya Era of 1988 provides a basis for some degree of religious freedom.

The government regulates mosques, religious schools, and clerics operating within the country to insure all views are in line with the state-approved form of Islam. The government strongly opposes militant forms of Islam, which it views as a threat. The government was tolerant of other religious groups but prohibited the proselytizing of Muslims. The World Islamic Call Society (WICS), an international education institute headquartered in Tripoli, aimed to provide Muslims from outside the Arab world with a broad education in literature, history, science, and religion. In addition, WICS also organizes vocational training programs and brings academic speakers to the country. WICS also maintains relations with non-Muslim religious groups in the country, including Christian churches.

Christian churches operated openly and were accepted by the authorities; however, the government imposed a limit of one church per denomination per city and prohibited proselytizing of Muslims. There were no official places of worship for minority religions such as Hinduism, Buddhism, and the Baha'i Faith.

A noncitizen female who marries a Muslim citizen was not required to convert to Islam; however, a noncitizen male must convert to Islam in order to marry a Muslim woman. The government supported the position that all citizens are Muslim, and marriages between non-Muslims were unacceptable. Burial of non-Muslims was not possible in Tripoli.

Societal Abuses and Discrimination

There were no reports of societal violence, harassment, or discrimination against members of religious groups.

Although no current statistics were available, the country's Jewish population was extremely small and possibly nonexistent. In 1974 the World Jewish Congress reported no more than 20 Jews resident in the country.

The government renovated a former Jewish school in Tripoli, which now serves as a city archive. In the absence of a Jewish community, there was no functioning synagogue.

In 2004 Qadhafi called for compensation for Jews whose property was nationalized by the government after 1948. Discussions regarding possible compensation for confiscated communal property have been ongoing since 2004.

For a more detailed discussion, see the *2006 International Religious Freedom Report*.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

The law stipulates that "each citizen, during the time of peace, may move freely, choose the place where he or she wishes to live, and may return to the country and leave whenever he or she chooses." The law on travel documents provides for these rights, and the government generally did not restrict the freedom of movement within the country. Authorities routinely seized the passports of foreigners married to citizens upon their entry into the country.

The law does not allow, nor does the government impose forced exile as a punishment. The government continued to encourage dissidents resident abroad to return and publicly promised their safety; however, HRW and AI reported two examples where the government detained dissidents returning from exile despite promises to the contrary (see section 1.d.). The government reportedly interrogated students returning from study abroad.

Protection of Refugees

There was no established system to protect refugees or national legislation to determine refugee and asylum status; therefore, the government did not grant refugee status or asylum. The country is not a party to the 1951 UN Convention relating to the Status of Refugees and its 1967 protocol; however, it is a party to the former Organization of African Unity's Convention Governing the Specific Aspects of Refugee Problems in Africa. In practice the government provided some protection against *refoulement*, the return of persons to a country where they feared persecution.

While the government has not signed a formal cooperation agreement with the UNHCR, the local UNHCR office had regular access to government officials and facilities and was able to conduct its work without significant restrictions.

The law prohibits the extradition of political refugees. Unlike in previous years, the government did not forcibly return any refugees. According to UNHCR the government started to differentiate between legitimate refugees and asylum seekers and other economic migrants; however, most Libyans failed to distinguish legitimate refugees and asylum seekers from the large immigrant population.

During 2005 approximately 12,600 refugees were registered with the UNHCR, although UNHCR estimates there were 30,000 refugees in the country. During the year UNHCR reported an increase in the number of refugee applications, which contributed to an eight-month waiting period for asylum seekers to receive an appointment with the organization. The majority of refugees are Palestinians and Somalis, followed by smaller numbers from Chad, Liberia, Guinea, and Sierra Leone.

The government stipulates that any foreigner who enters the country illegally shall be deported. The government maintained detention camps to hold noncitizens pending deportation and did not inform diplomatic representatives when their nationals were detained. There were reports of authorities leaving noncitizens in the desert without any aid. According to government figures, officials repatriated approximately 145,000 foreigners between 2003 and 2005.

Section 3 Respect for Political Rights: The Right of Citizens to Change Their Government

The law makes no provisions for elections, and citizens do not have the right to change their government. The country's governing principles stem from Qadhafi's Green Book, which combines Islamic ideals with elements of socialism and pan-Arabism. The Green Book states that direct popular rule is the basis of the political system and that citizens play a role in popular congresses; however, in practice Qadhafi and his close associates monopolized government decisions.

In August 2005 the quasigovernmental Qaddafi International Development Foundation, headed by Qadhafi's son Saif Al-Islam, launched an initiative calling for political reform, including greater press freedom, the release of political prisoners, and compensation for those who had been unfairly harmed by state actions. At year's end there were no new developments to the foundation's initiatives.

Elections and Political Parties

The government prohibits the creation of and subsequent membership in political parties. The 1977 Declaration on the Establishment of the Authority of the People dictates how citizens exercise their political rights. The government is structured in a pyramid of committees, communes, and congresses, each layer of which is involved in the selection of the next highest level. Citizens participate through numerous organizations, which include vocational, production, professional, and crafts congresses. Voting for the leaders of the local congresses is mandatory for all citizens over the age of 18.

The elected secretaries of these various congresses and committees select the members of the highest legislative organization, the GPC, which is composed of 760 members serving three-year terms.

In theory Revolutionary Committees, composed primarily of youth, guard against political dissent and ensure that citizens adhere to sanctioned ideology. These committees approve candidates for the GPC. In practice Revolutionary Committees played an unclear role in enforcing official ideology and appeared to be increasingly marginalized.

Elections occur every three years when the people's congresses, the local bodies comprised of all citizens, choose their leadership committees. The last renewal of people's congresses took place in March. The election process continues through the hierarchy of people's congresses, until the GPC chooses the General People's Committee, which manages the daily affairs of the government.

According to this year's UNDP report, women held 4.7 percent of the 760 seats in the General People's Committee. There was no reliable information on the representation of minorities in the government.

Government Corruption and Transparency

Government corruption was perceived to be a severe problem and favoritism, based on family ties, contributed to government inefficiency.

The law does not provide for public access to government information, and the government did not provide access in practice to citizens or foreign media.

Section 4 Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

Numerous charitable associations approved by the government operate in the country; however, the government prohibited the establishment of independent human rights organizations. Individuals wishing to carry out human rights work were forced to operate abroad due to restrictive laws that impose imprisonment for forming or joining international organizations without government authorization (see section 2.b.).

Associations engaging in unauthorized political activity are illegal. The government body known as the Libyan Arab Human Rights Committee did not release any public reports. The Libyan Society for Human Rights, operating under the sponsorship of the semiofficial Qaddafi International Development Foundation, followed government policy priorities rather than operating an independent entity.

The government slowly began to allow foreign nongovernmental organizations greater access. From April 17 to 25, a National Democratic Institute delegation visited for the first time to assess its political system and to gather information on the state of civil society. RSF conducted a fact-finding mission from September 13 to 17. The government permitted a three-week visit by a HRW delegation in May 2005 and a PHR delegation in March 2005. In 2004 AI visited after a 15-year absence.

Section 5 Discrimination, Societal Abuses, and Trafficking in Persons

The law prohibits discrimination based on race, sex, religion, disability, or social status; however, the government did not enforce these prohibitions effectively, particularly with regard to women and minorities.

Women

The 1969 Constitutional Proclamation granted women total equality; however, traditional attitudes and practices continue to discriminate against women. Shari'a law governs inheritance, divorce, and the right to own property.

The law prohibits domestic violence, but there was no reliable information on the penalties for punishment. There was little detailed information regarding the extent of violence against women; however, it reportedly remained a problem. Abuse within the family rarely was discussed publicly.

The law prohibits rape. The convicted rapist of a girl must marry the girl, with her agreement, or serve a prison term of up to 25 years.

The law does not distinguish between rape inside or outside of marriage. According to testimony by government officials before the United Nations, spousal rape occurred and was resolved by "social solutions."

The law does not prohibit female genital mutilation (FGM), which is foreign to the culture and society; however, there were reports that FGM occurred in remote areas of the country within African migrant communities.

The law prohibits prostitution; however, the authorities tolerated it.

Women and girls suspected of violating moral codes reportedly were detained indefinitely in "social rehabilitation" homes, which provide social services, including education and healthcare. Many detained in these facilities had been raped and then ostracized by their families. The government also stated that a woman was free to leave the homes when she reaches the "legal age" of adulthood (18 years old); if a male relative takes custody of her; or if she consents to marriage. According to HRW the government routinely violated women and girls' human rights in the home, including violations of due process, freedom of movement, personal dignity, and privacy.

The law criminalizes sexual harassment; however, there were no reports on how this law was enforced in practice.

The Department of Women's Affairs, under the GPC secretariat, collects data and oversees the integration of women into all spheres of public life. The General Union of Women's Associations, established by the government as a network of nongovernmental organizations, addresses women's employment needs. Traditional restrictions discourage women from playing an active role in the workplace and inhibit employment by women.

In general the emancipation of women was a generational phenomenon. Educational differences between men and women have narrowed; however, a significant proportion of rural women did not attend school and were inclined to instill in their children such traditional beliefs as women's subservient role in society.

Children

The government generally protects children's rights and welfare. Libya ratified the UN Convention of the Rights of the Child in 1993.

The government subsidized primary, secondary, and university education, and primary education was compulsory until age 15. According to a 2003 UNDP report, 96 percent of school-age children attended primary school and most reached at least a sixth-grade level. Only 53 percent of girls and 71 percent of boys attended secondary school. The government subsidized medical care, and improved the welfare of children; however, general economic mismanagement led to a low standard in medical services.

The law prohibits child abuse, and that prohibition was respected in practice.

Trafficking in Persons

The law prescribes punishments for trafficking in persons.

Women were believed to be trafficked through the country from Africa to Europe. Traffickers sometimes coerced persons into commercial sexual exploitation or forced labor in the country. Moroccan women reportedly were trafficked to the capital for commercial sexual exploitation. International organizations heard frequent complaints from foreign workers whose employers confiscated their passports or failed to pay their salaries (see section 6.e.). The government engaged in joint collaborations with other affected countries to combat illegal migration but did not address trafficking. Authorities did not screen illegal immigrants and those arrested for prostitution for evidence of trafficking prior to deportation or prosecution.

Persons with Disabilities

The law safeguards the rights of persons with disabilities and provides for monetary and other types of social care; however, the government had limited effectiveness implementing provisions. There are a number of government-approved societies that care for persons with disabilities. Access to employment, education, health care, and other state services were generally protected.

National/Racial/Ethnic Minorities

Arabic-speaking Muslims of mixed Arab-Amazigh ancestry constituted 97 percent of Libyan citizens. The principal minorities were Amazighs and sub-Saharan Africans.

There were frequent allegations of discrimination based on tribal status, particularly against Amazighs in the interior and Tuaregs in the south.

The law, as well as the Names Correction Committee, discriminates against non-Arabic languages and does not recognize the right of individuals to use their tribal names. The ban on the registration of non-Arabic names prevented the Amazighs from naming children in their language.

Section 6 Worker Rights

a. The Right of Association

The law allows workers to form and join unions without previous authorization or excessive requirements, and the government respected this right in practice. Members of each profession may form their own unions and syndicates to defend their professional rights. Workers may join the National Trade Unions' Federation, which is administered by the people's committee system; however, the government prohibited foreign workers from joining this organization. The federation played an active role in the International Confederation of Arab Trade Unions, the Organization of African Trade Union Unity, and the World Federation of Trade Unions.

b. The Right to Organize and Bargain Collectively

The law circumscribes unions' conduct of their activities. For example, the government must approve all collective agreements made between unions and employers to ensure that they were in line with the country's economic rights. The law does not provide workers with the right to strike, and there were no reports of strikes during the year. In January the government shortened the standard work week from six days to five days.

There were no export processing zones.

c. Prohibition of Forced or Compulsory Labor

The law prohibits any form of forced or compulsory labor, including by children, and there were no reports that such practices occurred.

d. Prohibition of Child Labor and Minimum Age for Employment

The law provides that children under the age of 18 may not be employed in any form of work, unless it is done as a form of apprenticeship. There was no information available on the prevalence of child labor.

There was no information regarding whether the law limits working hours or sets occupational health and safety restrictions for children. The Ministry of Manpower is responsible for preventing child labor.

e. Acceptable Conditions of Work

The labor law defines the rights and duties of workers, including matters of compensation, pension rights, minimum rest periods, and working hours. During the year the government shortened the legal work week from 48 to 40 hours. The law stipulates the minimum wage, standard working hours, night shift regulations, dismissal procedures, and training requirements. Employment laws generally favor the employee. The law does not specifically prohibit excessive compulsory overtime.

Wages are forbidden by the Green Book and paid in the form of "entitlements," which frequently were in arrears. A public sector wage freeze imposed more than a decade ago continued. The highest salary under the wage freeze was $227 (300 dinars) per month; many families lived on a significantly lower income. In July the World Bank reported that the government enforced the minimum wage of $68 (85 dinars) per month. Although there was no information available regarding whether the average wage was sufficient to provide a worker and family with a decent standard of living, the government heavily subsidized rent, utilities, and food staples.

Labor inspectors were assigned to inspect places of work for compliance with government-defined health and safety standards, and the law grants workers the right to court hearings regarding health and safety standards. Certain industries, such as the petroleum sector, attempted to maintain standards set by foreign companies. There was no information regarding whether workers may remove themselves from an unhealthy or unsafe work situation without jeopardizing their employment.

Foreign workers reportedly constituted 1.6 million of the 3.2 million workforce; however, the labor law does not accord foreign workers equal treatment. Foreign workers were permitted to reside in the country only for the duration of their work contracts, and they could not send more than half of their earnings to their home countries. They were subjected to arbitrary pressures, such as changes in work rules and contracts, and had little option other than to accept such changes or depart the country. Many foreign workers were deported arbitrarily for not having newly required work permits for unskilled jobs they already held.

 BACK TO TOP

Published by the U.S. Department of State Website at http://www.state.gov maintained by the Bureau of Public Affairs.